# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

INTERNATIONAL FOREST
PRODUCTS, LLC,

*Plaintiff,*

v.

AAR MANUFACTURING, INC.,

*Defendant.*

Case No. 22-CV-2002-EFM

AAR MANUFACTURING, INC.,

*Counter-Plaintiff,*

v.

INTERNATIONAL FOREST
PRODUCTS, LLC,

*Counter-Defendant.*

## MEMORANDUM AND ORDER

Before the Court is Defendant/Counter-Plaintiff AAR Manufacturing, Inc. ("AAR")'s Motion for Summary Judgment (Doc. 122) and Plaintiff/Counter-Defendant International Forest Products, LLC ("IFP")'s Partial Motion for Summary Judgment (Doc. 131). Related are the parties' respective Motions to Exclude Expert Testimony (Docs. 120, 125). IFP claims that AAR breached their Supply Agreement by failing to meet minimum purchasing requirements, honor IFP's right-of-first-refusal, and provide adequate termination notice. In contrast, AAR argues that IFP waived its purchasing minimums and right-of-first-refusal, anticipatorily repudiated the Supply Agreement, and shifted their arrangement to a month-to-month purchasing model, under which AAR fulfilled its obligations. For the reasons stated below, the Court grants AAR's Motion

for Summary Judgment and grants in part and denies in part IFP's Motion for Partial Summary Judgment.

## I.    Factual and Procedural Background[1]

IFP is a Kansas LLC with two members. Mike Kincaid is IFP's majority owner, president, and managing member. Stephen Wilde is IFP's minority owner. IFP del Ecuador SA ("IFP Ecuador") is a corporation organized under the laws of Ecuador and is approximately 99.9998% owned by IFP. AAR is an Illinois corporation with its principal place of business in Michigan.

IFP oversees the production and sale of balsa wood products to various industrial manufacturers. IFP arranges deliveries, handles customs, and invoices customers. In contrast, IFP Ecuador purchases raw balsa wood, manufactures it in its Ecuador factory, and sells it to IFP.

AAR is an industrial manufacturer who manufactures certain supplies for the United States Air Force, among other customers. Specifically, AAR uses the balsa sheets supplied by IFP to create wooden pallets for the Air Force. Each Air Force pallet requires four sheets of 2.08" thick balsa in AAR's manufacturing process. IFP also sold AAR 1.14" and 0.945" thick balsa sheets. However, the 2.08" sheets represent about 97% of all AAR's sheet purchases with IFP.

On September 9, 2011, IFP and AAR entered into a written Supply Agreement. In it, IFP agreed to supply, and AAR agreed to pay for, certain balsa wood products until May 31, 2013 (the "Agreement Term"). The agreement was hand-signed by IFP's President, Mike Kincaid, and AAR's General Manager, Lee Krantz. The Supply Agreement contained product pricing, purchasing requirements, and other obligations.

Specifically, the pricing section directed:

AAR shall purchase from [IFP] the Material in accordance with the prices set forth on the following basis until 2/1/12:

---

[1] The facts in this section are uncontroverted by the parties unless otherwise cited.

AAR part number 12001001 [2.08"] = $61.60
AAR part number 12001296 [1.14"] = $29.49
AAR part number 12000016 [0.945"] = $25.37

After February 1, 2012, the Supply Agreement specified that IFP would adjust its price per panel by factoring wood and labor costs. After making these calculations on February 1, 2012, the new baseline price would be valid through January 31, 2013. On February 1, 2013, IFP would again adjust the price based on wood and labor costs to determine a new baseline price for deliveries made through May 31, 2013. IFP promised that the price increase would not exceed 7% of the prices in effect on January 31, 2012.

The Supply Agreement's purchasing requirements directed:

> If AAR has pallet delivery orders from the Air Force, and the returned pallets assets to support production, AAR will schedule a minimum of 5 truck loads per month for the period of 1/1/12 to 5/31/13 and provide IFP the right of first refusal for the first seven trucks per month during the course of this contract. AAR is not obligated to purchase 5 trucks of Balsa per month from IFP if they do not have enough pallets or delivery order funding from the Air Force to support the consumption of 5 trucks of Balsa per month.[2]

The Supply Agreement also contained a modification provision which allowed changes to the agreement under three conditions. A valid amendment must (1) reference the Supply Agreement; (2) be reduced to writing in a separate agreement; and (3) be executed by authorized representatives from both parties. The Supply Agreement was formally amended four times between 2013 and May 29, 2019. In addition, the parties mutually agreed to amend balsa pricing through a series of phone calls or emails without following the formal amendment requirements.

The parties formally amended the Supply Agreement for the first time on November 30, 2012, and incorporated the material terms of the original Supply Agreement (the "First

---

[2] A later amendment to the Supply Agreement clarified that "a truck is defined as fifty two (52) pallets or one thousand one hundred and forty four (1144) panels of AAR part number 12001001."

Amendment"). The First Amendment met the amendment requirements. It extended the Agreement Term from May 31, 2013, through August 31, 2016. It also changed the purchasing requirements to a five-truck minimum of IFP's balsa wood if AAR had sufficient demand from the Air Force. Moreover, the First Amendment gave IFP a right-of-first-refusal ("ROFR") on truck deliveries over five per month and less than eight. The First Amendment's "Ratification" provision left all other terms and conditions of the Agreement unchanged.

The parties formally amended the agreement a second time on December 5, 2013, and again incorporated the material terms from the original Supply Agreement (the "Second Amendment"). The Second Amendment met the amendment requirements. It extended the Agreement Term from August 31, 2016, through August 31, 2018. It left intact AAR's requirement to purchase a minimum of five trucks of balsa wood materials if it had sufficient demand from the Air Force, but it expanded the ROFR on truck deliveries to over five per month and less than 11 per month. The Second Amendment included a Ratification provision.

The parties formally amended the Agreement a third time on May 9, 2016, again incorporating the material terms from the original Supply Agreement (the "Third Amendment"). The Third Amendment met the amendment requirements. It extended the Agreement Term from August 31, 2018, through August 31, 2023. Similarly, the Third Amendment included a Ratification provision.

In 2019, the global demand for raw balsa wood materials surged, largely driven by Chinese companies purchasing balsa wood to manufacture wind farm components. The increased demand for, and resulting scarcity of, balsa wood drove up balsa prices. In January 2019, pursuant to a request from AAR, IFP agreed not to raise prices for balsa orders from February 1, 2019, through May 31, 2019. This agreement did not follow the formal amendment requirements. Around this

same time, IFP began communicating with Chinese buyers who expressed interest in purchasing its balsa.

On June 18, 2019, the parties executed an amended version of the original Supply Agreement (the "Fourth Amendment"). This Amendment was in writing, referenced the parties' original Supply Agreement and the prior amendments, and was executed by hand signatures of IFP's President, Michael Kincaid, and AAR's General Manager, Lee Krantz. The Fourth Amendment did not change the Agreement Term, nor did it change the purchasing requirements or ROFR. However, it did fix the price of 2.08" balsa sheets at $69.14 from June 1, 2019, until January 31, 2020. The Fourth Amendment likewise contained a Ratification provision.

Just one day later, on June 19, 2019, IFP requested another price increase in addition to the ones the parties had just negotiated in the Fourth Amendment. IFP told AAR that without "additional compensation," IFP would "very, very seriously consider[] limiting [its] supply of balsa to AAR." AAR ultimately agreed to pay $71.21 for the 2.08" sheets on deliveries from September 1, 2019, through January 31, 2020. This agreement did not follow the formal amendment requirements.

On September 27, 2019, AAR submitted an initial contract bid to the Air Force to repair and produce its cargo pallets for a term of five years. It based its bid on the $71.21 balsa price. The contract obligated AAR to perform for 12 months with four 12-month options.

In November 2019, IFP Ecuador signed a direct export deal with a company from China.[3] IFP discussed additional supply agreements with other Chinese companies and told prospective clients that it had contracts pending with Chinese companies. IFP told one prospective client that

---

[3] This deal eventually fell through, as the Chinese company never signed on its end.

its Chinese client with whom it signed the export deal requested that IFP reserve all available balsa product for them.

Internal emails between Kincaid and Wilde revealed that IFP explored terminating its Supply Agreement with AAR and discussed staying AAR's purchase orders from November 2019 through May 2020 "until [IFP's] China business is more clear."[4]

On December 12, 2019, IFP told AAR that it wanted to schedule a meeting before Christmas to discuss balsa availability and increasing balsa prices. That same day, AAR was scheduled to meet with the Air Force to discuss its bid. AAR told IFP that it would like to have information on balsa pricing before its meeting with the Air Force. In response to AAR's request for pricing, IFP replied:

> IFP has enjoyed its relationship with AAR but if AAR sourcing their balsa requirements with another supplier is what AAR feels is in their best interests feel free to do so. Committing to a firm fixed cost for balsa today, for five years into the future, isn't something IFP can do but perhaps someone else with a different asset base feels that's doable.

On December 16, 2020, IFP's Kincaid met with AAR personnel, including General Manager, Lee Krantz, at AAR's offices in Michigan to discuss the situation between IFP and AAR. At this meeting, the parties failed to come to a new agreement with respect to pricing.

On December 19, 2019, IFP sent AAR an email as a follow up to the December 16th meeting. In it, IFP provided information for support on pricing. The end of the email reads: "IFP has to have price relief or we can't operate. The reality is the cost of providing to AAR balsa panels has risen beyond anything anyone could have reasonably foreseen and those cost increases go beyond just the raw cost of wood."

---

[4] IFP ultimately fulfilled all of AAR's confirmed purchase orders for November 2019, December 2019, and January 2020.

On January 6, 2020, IFP again emailed AAR:

IFP is at a timing/wood purchase crossroad with AAR product production. . . . For IFP to continue to purchase wood from our suppliers and in turn manufacture panels for AAR isn't feasible at this time given the extreme cost changes that have occurred. . . . IFP is currently in an untenable situation and either we are able to pass along the increased cost for AAR's product production as well as obtaining a pricing mechanism that allows IFP future adjustments for pricing or we will be forced to shut down wood procurement for AAR's product.

On January 7, 2020, AAR emailed the Air Force to explain that AAR needed to adjust or rescind its bid because AAR's primary supplier, IFP, "cannot quote any long term price for wood but rather spot buys based on a daily quote with a short validity, available at time of each individual Delivery Order."

On January 15, 2020, AAR asked IFP for a balsa price quote on IFP letterhead to justify February's proposed price. IFP replied with an attached document reading: "Balsa Pricing 12001001 panels; Price: $106.82." AAR told IFP that it needed a "real looking quote" with "quantity, size, terms, lead time, etc."

On January 16, 2020, IFP replied with a new attached document. The attachment read: "IFP submits for consideration two (2) proposals, The first proposal is for a 2020 fixed price. The second proposal is for a 2020 adjustable price." The Fixed Price Offer ("FPO") priced the 2.08" sheets at $145.17 for all product orders accepted prior to January 1, 2021. The Adjustable Price Offer ("APO") priced the 2.08" sheets at $106.82 for product ordered from February 1, 2020, to February 28, 2020. The APO stated that "future pricing will be determined by the wood cost increase or decrease IFP incurs after 2/1/20 on a month to month basis."

Sometime between January 16, 2020, and February 7, 2020, IFP told AAR "[I]t's distinctly possible IFP could not/would not do more than 5 trucks a month." AAR asked IFP to inform it as soon as possible of IFP's position so that AAR could find other sourcing if IFP could not meet AAR's balsa requirements. Kincaid sent Wilde an internal email stating, "My inference after

speaking with [AAR] many times is they currently do not have anyone else lined up that would supplement whatever IFP doesn't take. . . . I think we could 'pinch' AAR with potential lack of supply from IFP and get [purchase orders] thru 2020."

On February 28, 2020, AAR told IFP that after several discussions with the Air Force, the Air Force was leaning towards the APO over the FPO. AAR and IFP negotiated the exact terms of the agreement, and the APO was finalized on February 29, 2020. The official offer was attached to a February 29th email and stated the following:

> Date: 3/2/20
> IFP is submitting an adjustable price proposal for your consideration. Timing is of the essence in confirming production.
> Product: 12001001 Core Balsa Wood 41" x 51" x 2.08"
> Price: $106.82 for product from 3/1/20 to 3/31/20. Future pricing will be determined by the wood cost increase or decrease, on a month to month basis, IFP incurs to produce AAR product after 3/1/20 provided however 2020 prices not to exceed $145.17
> Terms: Termination for convenience by IFP with ninety (90) days written notice will be applicable to this contract.
> Payment: Net 30
> Lead Time: 120 days minimum
> Capacity: 18,000 panels (12001001) subject to availability as determined by other customer orders.

IFP sent variations of this APO almost every month for the next 17 months. Specifically, between March 2020 and August 2021, IFP submitted 14 different APOs to AAR, with each "offer" proposing terms "applicable to this contract." None of these monthly APOs referenced the original Supply Agreement, made any reference to prior amendments, included a ratification clause, or were signed or otherwise executed by anyone from AAR.

On April 21, 2020, AAR and the Air Force finalized their contract. About a year later, in March 2021, AAR issued purchase orders with IFP from March through August 2021. IFP continued to send AAR regular, monthly APOs through May 2021. However, IFP stopped sending APOs after May. On July 21, 2021, IFP asked AAR to send it AAR's purchase orders for

September. That day, AAR replied that it would no longer be issuing any new purchase orders at the time because it had not received any updated price adjustments since May, and IFP's last price was still "considerably high."

IFP replied to AAR's email the next day. IFP attached to the email invoices from AAR's June and July orders, each order's respective delivery date, and pricing sheets. IFP urged AAR that prices should continue trending downward for 2021. AAR did not reply.

On August 18, 2021, IFP sent AAR an APO for the month of August. AAR did not place any more orders with IFP.

On August 25, 2021, IFP's attorneys sent AAR a formal demand letter that referred to AAR's July 21, 2021 communication as an "attempted termination of the [Supply] Agreement" and demanded that AAR "compensate IFP for months in which AAR failed to order the five-truck minimum and AAR's failure to offer IFP the opportunity to exercise its first rights of refusal under the Agreement, in an amount of not less than $1,238,645." IFP further demanded that AAR "meet its minimum order obligations under the Agreement going forward." AAR refused to meet IFP's demands.

On January 3, 2022, IFP filed suit against AAR. In Count I, IFP brought a breach of contract claim, arguing that AAR breached the Supply Agreement by ordering less than the required five-truck minimum and failing to provide IFP the opportunity to exercise its ROFR. In Count II, IFP brought a tortious interference claim, arguing that IFP Ecuador suffered damages due to AAR's wrongful breach.

On March 4, 2022, AAR filed a motion to dismiss IFP's claims. On August 3, 2022, the Court granted AAR's motion to dismiss IFP's tortious interference claim but denied AAR's motion to dismiss IFP's breach of contract claim.

On August 24, 2022, AAR filed a counterclaim against IFP. In it, AAR brought two counts of breach of contract. In Count I, AAR argued that IFP anticipatorily repudiated the Supply Agreement when it told AAR that it would not perform according to the parties' pricing arrangement and would not abide by its contractual obligation to provide AAR with five trucks of balsa per month. In Count II, AAR argued that IFP unilaterally increased prices by more than 7% of its 2019 prices, which breached the price caps established by the Supply Agreement and its Amendments.

On March 19, 2024, AAR moved for summary judgment on IFP's damages claims. That same day, IFP moved for summary judgment on both of AAR's breach of contract claims. Additionally, IFP moved for summary judgment on whether AAR's agents could bind AAR and whether AAR wrongfully terminated the Supply Agreement. Each party submitted timely responses and replies. The matters, being fully briefed, are now ripe for the Court's ruling.

## II.    Legal Standard

### A.    Choice of Law

The parties believe and agree that the substantive issues in this case are governed by Illinois law. "Under traditional choice of law principles, the law of the forum State controls procedural questions, and the law of the State in which the cause of action accrued governs substantive issues."[5] This rule is just as applicable where the substantive law is chosen by the parties in a contract rather than by the court under the relevant choice of law rules.[6]

---

[5] *Cox v. Kaufman*, 212 Ill. App. 3d 1056, 1062, 571 N.E.2d 1011 (1991).

[6] *Bridge Prods., Inc. v. Quantum Chem. Corp.*, 1990 WL 19968, at *4 (N.D. Ill. Feb. 28, 1990) (citing *Fed. Deposit Ins. Corp. v. Petersen*, 770 F.2d 141, 142 (10th Cir.1985) ("Choice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law such as statutes of limitation.")).

Here, the contract stated that the parties' agreement "shall be governed and construed in accordance with the laws of the State of Illinois without regard to its conflict of law rules." As such, the Court will apply Illinois law to substantive issues. However, because the parties filed suit in Kansas, the Court will apply Kansas law to procedural issues.

**B.    Summary Judgment**

The standards for deciding summary judgment are procedural questions, so the forum state's interpretation of the Federal Rules of Civil Procedure governs.[7] Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[8] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[9] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[10] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[11] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[12] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[13]

---

[7] *Landess v. Borden, Inc.*, 667 F.2d 628, 630 n.2 (7th Cir. 1981) (affirming the district court's application of Fed. R. Civ. P. 56).

[8] Fed. R. Civ. P. 56(a).

[9] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[10] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[11] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[12] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[13] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

### III.     Analysis

In their respective motions, both parties assert entitlement to summary judgment on several key issues, including whether IFP anticipatorily repudiated the agreement, whether IFP waived its contractual rights, and whether the parties transitioned to a month-to-month purchasing arrangement. The resolution of each of these questions impacts the parties' potential damages recovery, particularly concerning minimum purchasing requirements, price caps, and exclusivity provisions. The Court will address each of these issues in turn.

### A.     Anticipatory Repudiation

IFP argues that it is entitled to summary judgment on AAR's anticipatory repudiation counterclaim—AAR's Count I. IFP claims that it made no clear and unequivocal statement that it would no longer perform its obligations under the Supply Agreement, and its communications on December 12, 2019, were no more than requests for modification, which AAR negotiated and ultimately agreed to on March 2, 2020. In contrast, AAR claims that IFP repudiated the Supply Agreement on December 12, 2019, and entered into a new ad hoc month-to-month arrangement starting March 2, 2020.

Under Illinois law, "[t]he doctrine of anticipatory repudiation requires a clear manifestation of an intent not to perform the contract on the date of performance."[14] "A party's actions "may constitute an anticipatory repudiation of the contract if the actions are sufficiently clear manifestations of an intent not to perform under the contract."[15] An inference from language or ambiguity "is insufficient to constitute a repudiation under well-settled Illinois law" because

---

[14] *In re Marriage of Olsen*, 124 Ill. 2d 19, 24, 528 N.E.2d 684 (1988).

[15] *Hessler v. Crystal Lake Chrysler-Plymouth, Inc.*, 338 Ill. App. 3d 1010, 1022, 788 N.E.2d 405 (2003).

"Illinois law requires a repudiation be manifested clearly and unequivocally."[16] "Because the doctrine of anticipatory repudiation represents a harsh remedy, the requirement that the repudiating statement be clear and absolute is a strict one."[17]

In contrast, doubtful or indefinite statements that performance may or may not take place are insufficient to constitute anticipatory repudiation.[18] Repudiatory statements are "not made conditional based on any response from [the plaintiff]," and they are "not framed as mere proposals."[19] Rather, these types of proposals are considered requests for modification, and even when coupled with an implication that performance will not occur, requests for modification are insufficient to establish repudiation.[20]

Here, on June 18, 2019, the parties signed the Fourth Amendment, which fixed the price of 2.08" balsa sheets at $69.14 from June 1, 2019, until January 31, 2020. After January 31, 2020, IFP could increase the cost of balsa sheets to account for labor and production costs, but it capped the increase at 7%. IFP then came to AAR the next day and asked for another price increase. The parties mutually agreed to increase the price of 2.08" balsa sheets to $71.21 from September 1, 2019, until January 31, 2020.

Come December 12, 2019, IFP again contacted AAR to schedule a meeting to discuss raising balsa prices in the new year. When AAR asked IFP to provide it details about what the new price per sheet would be, AAR replied:

> I wish I could say with any confidence where wood costs are going. . . . [A] panel that costs today $71.21 will cost $115.20 in the future and that is at today's wood costs. . . . [W]e don't see prices even stabilizing let alone coming down. . . . IFP has

---

[16] *Rudolph v. United Airlines Holdings*, 519 F. Supp. 3d 438, 451 (N.D. Ill. 2021) (further citations omitted).

[17] *LAK, Inc. v. Deer Creek Enters.*, 976 F.2d 328, 331 (7th Cir. 1992) (further citations omitted).

[18] *Rudolph*, 519 F. Supp. 3d at 451 (further citations omitted).

[19] *Maxtech Consumer Prods., Ltd. v. Chervon N. Am. Inc.*, 2019 WL 2743463, at *4 (N.D. Ill. July 1, 2019).

[20] *See Truman L. Flatt & Sons Co., v. Schupf*, 271 Ill. App. 3d 983, 987, 649 N.E.2d 990 (1995).

enjoyed its relationship with AAR but if AAR sourcing their balsa requirements with another supplier is what AAR feels is in their best interests feel free to do so. Committing to a firm fixed cost for balsa today, for five years into the future, isn't something IFP can do but perhaps someone else with a different asset base feels that's doable.

Here, the parties do not dispute the contents of this email. Rather, they dispute what was meant by it. AAR claims that this statement was a "crystal clear" indication that IFP would no longer perform the contract under the Fourth Amendment's pricing terms. However, IFP contends that the language in the email indicates a request for modification—not an unequivocal cancelation of the entire contract.

The Court does not find the language in this email sufficient to constitute an anticipatory repudiation. Anticipatory repudiation must be unconditional, meaning a party refuses to perform "without justification."[21] First, this email provides no indication that after December 12, 2019, IFP would refuse to deliver any more trucks to AAR. Second, even if IFP had refused to deliver trucks, it seems clear that such refusal is based on a condition—that is, AAR's refusal to agree to increased balsa prices. Thus, in that scenario, IFP has at least provided a justification, even if poor, for refusing to perform. The email makes clear that IFP cannot commit to a fixed price, but it is open to other pricing options. This expression of "some willingness to talk and even to cooperate" dispels repudiation.[22] Accordingly, IFP did not anticipatorily repudiate the contract, so IFP is entitled to summary judgment on Count I of AAR's counterclaim.

---

[21] *Busse v. Paul Revere Life Ins. Co.*, 341 Ill. App. 3d 589, 594, 793 N.E.2d 779 (2003); *see also Mullis v. Brennan*, 716 N.E.2d 58, 64 (Ind. Ct. App. 1999) (noting that the repudiation must be "positive, absolute, and unconditional").

[22] *Commonwealth Edison Co. v. Decker Coal Co.*, 1986 WL 1010, at *2 (N.D. Ill. Jan. 8, 1986).

## B.    Waiver

Closely related to the anticipatory repudiation issue is the question of waiver. AAR moves for summary judgment on IFP's damages claim, arguing that IFP waived the five-truck purchasing minimum and ROFR on all orders placed after December 2019 based on its statements in the December 12, 2019 email. Essentially, AAR claims that even if IFP itself did not breach, it invited AAR to breach by "lull[ing] [AAR] into a false assurance that strict compliance with [its] contractual duty will not be required and then sue[d] for non-compliance."[23] Illinois courts have long disallowed bait-and-switch tactics like this, holding that waiver prevents it.[24]

"Waiver is an express or implied voluntary and intentional relinquishment of a known and existing right."[25] "An implied waiver may arise from either of two situations: (1) an unexpressed intention to waive can be clearly inferred from the circumstances; or (2) the conduct of one party has misled the other party into a reasonable belief that a waiver has occurred."[26] "The party claiming implied waiver has the burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights."[27] "[W]aiver is a question of fact when the material facts are in dispute or when 'reasonable minds' differ from the inferences drawn from undisputed evidence."[28] "Where there is no dispute as to the material facts and only one reasonable inference can be drawn from them, the question of waiver is a matter of law."[29]

---

[23] *Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979).

[24] *See id.*

[25] *Batterman v. Consumers Ill. Water Co.*, 261 Ill. App. 3d 319, 321, 634 N.E.2d 1235 (1994).

[26] *Id.*

[27] *In re Nitz*, 317 Ill. App. 3d 119, 130, 739 N.E.2d 93 (2000).

[28] *Wagner Excello Foods, Inc., v. Fearn Int'l, Inc.*, 235 Ill. App. 3d 224, 233, 601 N.E.2d 956 (1992).

[29] *Id.*

To start, the parties' business relationship was governed by a quasi-conditional-requirements contract. In a pure conditional requirements contract, exclusivity is granted, either implicitly or explicitly, to the supplier.[30] Although "the inclusion of a right of first refusal clause does not, in and of itself, negate exclusivity," it can if the supplier outright releases the buyer or if the supplier refuses "to match the terms of another supplier's written offer."[31]

Here, the parties agreed that, subject to Air Force demand, AAR must use IFP for trucks 1–5, AAR may use any supplier for trucks 6–10 with IFP's approval, and AAR may use any supplier after truck 10 without IFP's approval. Thus, from the start, the parties had a pure exclusivity agreement on trucks 1–5, a conditional exclusivity agreement on trucks 6–10, and no exclusivity agreement on trucks after 10.

But then, on December 12, 2019, IFP told AAR to "feel free" to "sourc[e] their balsa requirements with another supplier . . . someone else with a different asset base" if "AAR feels [that] is in their best interests." IFP's statement qualifies as a voluntary relinquishment of a known right—specifically, IFP's right to serve as AAR's exclusive balsa supplier for up to 10 truckloads each month. Logically, this statement could only apply to trucks 1–10 because AAR already had the right to contract with any supplier after truck 10. IFP's language lulled AAR into an assurance that AAR may start contracting with other suppliers that offer better prices, and IFP released AAR from strictly complying with their exclusivity agreement.

Such a waiver has massive implications in this case because "[a]n essential element of a requirements contract is the promise of the buyer to purchase exclusively from the seller either the

---

[30] *Torres v. City of Chicago*, 261 Ill. App. 3d 499, 504-05, 632 N.E.2d 54 (1994); *see also Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465, 467 (6th Cir. 1989) ("A promise to purchase exclusively from one supplier may be either implicit or explicit.").

[31] *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 876 F. Supp. 2d 1042, 1053–54 (N.D. Ind. 2012).

buyer's entire requirements or up to a specified amount. Without exclusivity, the buyer in a requirements contract has effectively promised nothing of value to the seller."[32] In the absence of a promise of exclusivity, "the requisite mutuality and consideration for a requirements contract is absent. The promise of the seller becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer."[33]

Based on IFP's waiver of exclusivity, the Court finds that the monthly APOs were nothing more than invitations for orders. This finding is consistent with the parties' language and actions beginning in early 2020. Before 2020, the Supply Agreement and each subsequent Amendment contained a section entitled "Pricing," which fixed the cost of materials on an annual basis. Never before had the parties discussed the cost of materials in terms of "price quotes" or "offers." On January 15, 2020, AAR asked IFP to send it a "real looking quote" with quantity, size, terms, and lead time. On January 16, 2020, IFP sent AAR an email with the subject line reading, "quote." In it, IFP proposed a "Fixed Price *Offer*" and an "Adjustable Price *Offer*."

There are two reasons the APOs themselves did not constitute a fully consummated contract. First, "a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract."[34] "[I]t is most often the buyer's purchase order, submitted in response to such a quotation that constitutes the offer."[35] It is evident that this is how the parties intended for their agreement to work based on the limiting language in the "Capacity" section. For months, the APO's "Capacity" section subjected fulfillment of AAR's purchase orders "to availability as

---

[32] *Torres*, 261 Ill. App. 3d at 504–05 (further citations and quotations omitted).

[33] *See id.* at 505 (further citations and quotations omitted).

[34] *E.C. Styberg Eng'g Co. v. Eaton Corp.*, 492 F.3d 912, 918 (7th Cir. 2007).

[35] *Id.* (further citations and quotations omitted).

determined by other customer orders"—meaning AAR's purchase order constituted the offer, but IFP's ultimate approval would determine acceptance, without which no contract would be formed.

Second, despite AAR asking IFP to include a quantity term, IFP did not include one. Because IFP waived exclusivity, the parties no longer had a minimum purchasing requirement. But to form a contract for the sale of goods, the quantity term is an essential element—not one that the UCC can gap-fill.[36] None of the APOs, however, contained a quantity term. Rather, AAR's purchase orders contained their desired quantity, and IFP ultimately accepted or rejected AAR's request. Thus, this is further evidence that the APOs were invitations for offers, the purchase orders were the offers, and IFP's acceptance consummated the contract.

Ultimately, IFP's waiver of the Supply Agreement's exclusivity provision transformed the parties' quasi-conditional-requirements contract into an invitation for orders. Under this new arrangement, AAR no longer had an obligation to purchase trucks 1–10 exclusively from IFP. Therefore, because a quantity term was no longer in place, and quantity is an essential element for contract formation, the parties no longer had a binding contract. However, the parties did have several binding short-term contracts from March 2020 until July 2021. Importantly, those monthly contracts were not formed until IFP accepted AAR's offer—that offer being the purchase orders, each of which contained clear quantity terms. As such, AAR is entitled to summary judgment on IFP's damages claim for underordered materials after December 2019.

## C.    Apparent Authority

IFP contends that it is entitled to summary judgment on the issue of whether AAR's agreement to the APO was authorized and valid. The parties dispute whether AAR's Senior

---

[36] *Control Sols., LLC v. Oshkosh Corp.*, 2012 WL 3096678, at *6 (N.D. Ill. July 27, 2012) (citing *Ray Dancer, Inc. v. DMC Corp.*, 175 Ill. App. 3d 997, 1004, 530 N.E.2d 605 (1988)) ("In a contract for the sale of goods, the court can supply all missing terms *except* the quantity term." (emphasis in original)).

Procurement Specialist, Renee Kroes, and AAR's Supply Chain Director, Jennifer Frazer, exercised apparent authority to bind AAR to the terms of the APOs. The Court has already found that the APOs were invitations to submit offers and were not contracts themselves. Thus, without being a contract, the APOs contained no "terms" by which AAR could be bound.

However, Kroes and Frazer frequently issued purchase orders on behalf of AAR. To demonstrate apparent authority, one must show "(1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority."[37]

Here, Kroes was employed as AAR's Senior Procurement Specialist and Frazier was employed as AAR's Director of Supply Chain. Both reported to AAR's General Manager, Lee Krantz. A part of their job was to submit their materials orders for approval by Krantz and then place those orders with IFP. Krantz would authorize their orders, and often copy IFP on the emails. Thus, Kroes and Frazer had the authority to bind AAR to offers, but it was ultimately up to IFP to accept. Once IFP accepted AAR's offers, however, AAR was bound to pay for the materials it ordered. Therefore, the Court grants summary judgment to IFP to the extent it argues that Kroes and Frazier had apparent authority to bind AAR to its offers. But beyond this, Kroes and Frazer did not bind AAR to anything else.

## D.    Breach of Price Caps

IFP claims that it is entitled to summary judgment on AAR's breach of price caps counterclaim—AAR's Count II. In Count II, AAR argues that IFP breached the Supply Agreement

---

[37] *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 673 (7th Cir. 2004) (further citations omitted).

when it began charging prices in excess of the 7% price cap in 2020 and 2021. IFP argues that AAR agreed to the adjusted price for the 2.08" balsa sheets, so the 7% price cap was no longer applicable.

AAR brought this claim as an alternative argument had the Court found that the Supply Agreement was still in effect in March 2020. But, as stated above, the Court finds that the Supply Agreement was not in effect by March 2020. Rather, under the parties' new monthly arrangement, AAR agreed to adjustable pricing for 2.08" balsa sheets, so the price cap no longer applied. Thus, Count II of AAR's counterclaim is moot.

E.    **Wrongful Termination**

IFP seeks summary judgment on the issue of whether AAR wrongfully terminated the Supply Agreement by failing to provide IFP with 120 days written notice before it stopped placing purchase orders in July 2021. IFP claims that AAR's breach entitles it to damages from September 2021 through the end of the Supply Agreement's term in August 2023. Assuming the Supply Agreement was still effective by July 2021, AAR seeks summary judgment to bar IFP from claiming damages beyond 120 days after AAR provided IFP with notice of its termination.

As discussed above, as of July 2021, the Supply Agreement was no longer in effect, as the parties had moved to a system of monthly purchase orders. Consequently, AAR was under no binding obligation to make IFP an offer. Indeed, even if the APOs were offers—instead of invitations for offers—AAR was also under no obligation to accept.

AAR could not, however, terminate the contract once its purchase orders had been accepted. Only IFP could terminate "for convenience . . . with ninety (90) days written notice." When IFP approached AAR in July 2021, AAR had already submitted—and IFP had already accepted—purchase orders through August 2021. Thus, AAR would have breached its contract with IFP had it tried to terminate their agreement for July or August purchase orders. But that is

not what happened. Instead, IFP asked AAR to submit its purchase orders for September, and AAR declined to do so. AAR's declination to submit new purchase orders was their declination to submit an offer for a new contract—not their termination of an already-existing contract.

Thus, AAR neither breached nor wrongfully terminated its agreement with IFP. Accordingly, IFP cannot recover damages through August 2023 because it had no binding agreement for that term. Therefore, the Court denies IFP summary judgment on the issue of AAR's wrongful termination and grants AAR summary judgment to bar IFP from recovering damages for wrongful termination from September 2021 to August 2023.

**F.    Damages**

In addition to the merits of the case, the parties also dispute the scope of the damages IFP may seek. Specifically, AAR moves for summary judgment on four issues: (1) whether IFP can claim damages for orders unrelated to Air Force demand; (2) whether IFP can claim damages for orders before March 2020 where AAR failed to give IFP a ROFR; (3) whether IFP can claim damages on behalf of IFP Ecuador; and (4) whether IFP can seek damages for materials being stored in the Port of Baltimore. The Court will address each in turn.

*1.    Materials sufficient to meet the minimum purchasing requirements*

When the Supply Agreement was still intact, the parties dispute whether the five-truck monthly quantity requirement applied only to the 2.08" sheets or also included the 1.14" and 0.945" sheets. AAR argues that the quantity requirement applied only to the 2.08" sheets, and there was no minimum purchase order related to 1.14" and 0.945" sheets. In contrast, IFP claims that AAR was required to purchase at least five truckloads per month regardless of the type of material comprising the order.

"A court will first look to the language of the contract itself to determine the parties' intent."[38] "A contract must be construed as a whole, viewing each provision in light of the other provisions."[39] "The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract. If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning."[40]

The Supply Agreement reads: "If AAR has pallet delivery orders from the Air Force, and the returned pallets assets to support production, AAR will schedule a minimum of 5 truck loads per month for the period of [this contract]." Similarly, the paragraph entitled "Purchase Orders" in Amendments 1–4 clearly require AAR to "schedule a minimum of five (5) truck loads per month with IFP during the duration of this contract" unless AAR does "not have enough pallets or delivery order funding from the Air Force to support the consumption of 5 trucks of Balsa per month." These excerpts are the only contractual provisions that impose a quantity requirement. And the Court cannot supply missing quantity terms.[41]

The plain language of the contract reveals that AAR is excused from scheduling a minimum order of five truckloads per month from IFP if the Air Force fails to provide AAR with enough orders or order funding to justify the minimum purchase order. Accordingly, the Air Force's orders from AAR inform the exception to the contract between AAR and IFP.

---

[38] *Coin-Tainer Co. v. Pap-R Prods. Co.*, 2021 WL 3054996, at *6 (S.D. Ill. Apr. 26, 2021) (citing *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39 (2011)).

[39] *Id.*

[40] *Id.*

[41] *Ray Dancer, Inc.*, 175 Ill. App. 3d at 1004 ("The quantity term is the essential element of the writing because the contract is not enforceable beyond the quantity of goods shown in such writing. In a contract for the sale of goods, the court can supply all missing terms except the quantity term." (cleaned up)).

To fulfill its orders from the Air Force, AAR exclusively uses 2.08" sheets. AAR does not use 1.14" or 0.945" sheets to manufacture pallets for the Air Force. Thus, the five-truckload minimum can only apply to purchase orders for 2.08" sheets as that is the only sheet size used to fulfill the Air Force's pallet orders.

This conclusion is consistent with the fact that the 2.08" sheets represent about 97% of all AAR's sheet purchases with IFP. The 1.14" and 0.945" sheets comprise the other 3% of products AAR purchases from IFP. When considering the intent of the parties, it makes little sense that if AAR only had enough demand from the Air Force to necessitate one truckload of 2.08" sheets in a given month, it would be required to purchase four truckloads of 1.14" and 0.945" sheets when those sheet sizes comprise only 3% of AAR's overall orders.

As such, the Court concludes that the Supply Agreement and its subsequent Amendments are devoid of any quantity requirement for the 1.14" and 0.945" sheets. Thus, if IFP seeks damages based on AAR's failure to order at least five truckloads per month, it must do so based solely on the lack of orders for 2.08" sheets despite Air Force demand. Accordingly, the Court grants AAR summary judgment because IFP may not seek lost profits damages for AAR's failure to order a certain number of 1.14" and 0.945" sheets since those sheets are unrelated to Air Force demand.

### 2.    Damages for breach of the five-truck minimum and ROFR before March 2020

During the parties' contract, there were several months during which AAR ordered less than 10 trucks of 2.08" sheets from IFP yet simultaneously ordered truckloads of 2.08" sheets from other suppliers. IFP claims that it is entitled to damages for the times when AAR would place balsa orders with other suppliers without first offering IFP the ROFR.

On summary judgment, AAR claims that for the months IFP complains of smaller orders, AAR either (1) did not have Air Force demand to support more than five trucks or (2) offered its excess volume to IFP, and IFP exercised its ROFR. In contrast, IFP claims that AAR's balsa

purchase orders with other suppliers in addition to its purchase orders with IFP is evidence that AAR had Air Force demand for more trucks of 2.08" sheets. But instead of giving IFP the ROFR, AAR placed orders with other suppliers. AAR contends that IFP's assertions lack evidence to raise a genuine dispute of material fact.

The Court has already decided that the ROFR clause in the Supply Agreement only applied to 2.08" sheets. Thus, the Court will only evaluate orders for 2.08" sheets for this damages analysis.

Each party primarily relies on its own expert's report to support its argument. But both experts agree that there were several months during which AAR ordered less than 10 trucks of 2.08" sheets from IFP and yet ordered 2.08" sheets from other suppliers. The following chart uses data from both experts' reports and summarizes the months that AAR ordered 2.08" sheets from IFP versus other suppliers.[42]

| Month-Year | Number of 2.08" sheets AAR ordered from IFP | Trucks of 2.08" sheets AAR ordered from IFP[43] | Number of 2.08" sheets AAR ordered from other suppliers | Trucks of 2.08" sheets AAR ordered from other suppliers[44] |
|---|---|---|---|---|
| Jan-2014 | 9,724 | 8.500 | 3,136 | 2.741 |
| Nov-2014 | 9,152 | 8.000 | 8,626 | 7.540 |
| May-2015 | 9,152 | 8.000 | 784 | 0.685 |
| Jun-2015 | 6,776 | 5.923 | 1,568 | 1.371 |
| Sep-2016 | 8,008 | 7.000 | 784 | 0.685 |
| Mar-2019 | 10,868 | 9.500 | 784 | 0.685 |
| Apr-2019 | 6,820 | 5.962 | 2,352 | 2.056 |
| Oct-2019 | 6,776 | 5.923 | 784 | 0.685 |

---

[42] The Fourth Amendment to the Supply Agreement clearly states that one truckload of 2.08" balsa wood equals 1,144 sheets. AAR's expert assumed 1,144 sheets per truck in her calculations, citing page one of the Fourth Amendment as her source. IFP's expert assumed 1,444 sheets per truck, citing "IFP management" as his source.

[43] In accordance with the Fourth Amendment, the number of trucks in this column was calculated by dividing the number of 2.08" sheets by 1,144.

[44] As above, the number of trucks in this column was calculated by dividing the number of 2.08" sheets by 1,144.

From this data, it is clear that, at least during certain months, AAR had demand for 2.08" sheets beyond the orders it placed with IFP. But to determine whether AAR breached the Supply Agreement, two questions must be answered: (1) were these excess orders placed to fulfil AAR's contract with the Air Force, and (2) if they were placed to fulfil AAR's contract with the Air Force, did AAR offer IFP the ROFR on trucks 6–10 before placing these orders with another supplier?

The Supply Agreement obligated AAR to purchase five trucks of balsa per month from IFP *only if* AAR had enough pallets or delivery order funding from the Air Force to support the consumption of five trucks of balsa per month. This necessarily ties AAR's five-truck minimum to Air Force demand. The Supply Agreement does not require AAR to make purchases with IFP for other contracts AAR may have with its other customers.

AAR argues that the excess orders were unrelated to Air Force demand. For evidence, AAR relies on Krantz's testimony that "2.08-inch pallets are used in things other than the Air Force pallets." For example, he testified that AAR uses 2.08" sheets to manufacture two different types of commercial pallets, and AAR sells the type of pallets it makes for the Air Force to other entities. Thus, AAR claims that the excess orders were not related to Air Force demand. Rather, they were related to fulfilling orders placed by other customers. AAR has maintained this position since the beginning of this litigation. For instance, in response to IFP's interrogatories, AAR stated that it "did not have at least five trucks' worth of pallet delivery orders from the [Air Force] in each month from December 5, 2013 to March 2020."

IFP does not believe that AAR lacked Air Force demand, and claims that AAR failed to offer it the ROFR in those months that it did have sufficient demand. However, IFP does not produce evidence to support its suspicions of AAR's untruthfulness. Knowing how many sheets AAR ordered from IFP versus other suppliers is useless without any clear evidence of how many

pallets the Air Force ordered between 2013 and March 2020. The Court has not been provided with any clear evidence on this question.[45] Without knowing the Air Force's orders, it is impossible to tell whether AAR was under-ordering from IFP and supplementing its supply with other suppliers.

Therefore, without any evidence from IFP to dispute AAR's evidence that it used 2.08" sheets for other projects and AAR did not have five trucks' worth of Air Force orders every month between 2013 and March 2020, the Court cannot say that a genuine dispute of material fact exists. Accordingly, without evidence of Air Force demand, the Court cannot conclude that AAR breached the five-truck minimum and ROFR on orders before March 2020. Thus, the Court grants AAR summary judgment on excluding the cost of unordered trucks under the purchasing minimum prior to March 2020 from IFP's damages calculation.

### 3.    Damages for lost distributions from IFP Ecuador

The parties dispute whether IFP can claim damages for lost distributions from its subsidiary, IFP Ecuador, from December 2013 to August 2023. Under Illinois law, a plaintiff can recover lost profits as long as its "loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of the defendant caused the loss of profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into."[46]

---

[45] *Certain Underwriters at Lloyd's London v. Garmin Int'l, Inc.*, 781 F.3d 1226, 1230 (10th Cir. 2015) ("The Court will not sift through the record in an attempt to find a genuine issue of material fact or locate arguments."); *Triple-I Corp. v. Hudson Assocs. Consulting*, 713 F. Supp. 2d 1267, 1273–74 (D. Kan. 2010) ("It is the duty of the parties contesting a motion for summary judgment to direct the court to those places in the record where evidence exists to support their positions." (citations, quotations, and brackets omitted)).

[46] *Milex Prods., Inc. v. Alra Lab'ys, Inc.*, 237 Ill. App. 3d 177, 190, 603 N.E.2d 1226 (1992).

The Court is not convinced that lost profits can be proven to a reasonable degree of certainty or that AAR is the ultimate cause of IFP's lost profits. A "defendant's breach must be plainly traceable to specific damages."[47] This is because "lost profits are frequently the result of several intersecting causes," so "it must be shown with a reasonable degree of certainty that the defendant's breach caused a specific portion of the lost profits."[48]

Here, the uncontroverted evidence suggests that several factors contributed to IFP and IFP Ecuador's financial demise. For example, internal emails between IFP and IFP Ecuador in December revealed that IFP had a "massive reduction in China standard balsa processing." Moreover, in January 2021, IFP acknowledged that IFP Ecuador "is having some financial issues because China's business has stopped." Another email exchange three months later explained that IFP was experiencing financial consequences because its product costs were too high. Around this time, the Ecuadorian government declared a state of emergency in response to COVID-19 outbreaks, which IFP and IFP Ecuador acknowledged "heavily impacted" their balsa production due to "restricted availability and higher prices."

Additionally, according to IFP's expert report, the only distribution IFP Ecuador made to IFP was in December 2019. In his report of IFP's Historical Income Statement for 2020 and 2021, IFP's expert omits the line item "Distributions from Subsidiary" completely. Moreover, he provides no analysis of IFP's Historical Income Statement or its distributions in 2022 or 2023. Thus, it is not apparent how AAR's alleged breach of contract in July 2021 impacted IFP's distributions at all. Because IFP has failed to demonstrate to a reasonable degree of certainty how

---

[47] *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 316, 515 N.E.2d 61 (1987).

[48] *Id.*

AAR's actions caused IFP Ecuador to suffer lost distributions, AAR is entitled to summary judgment on this issue.

### 4.    *Damages for materials stored in Baltimore*

IFP seeks damages for six trucks of 2.08" balsa panels delivered to the Port of Baltimore, which IFP claims has cost it $768,114 in damages. AAR argues IFP has not filed an amended complaint putting this specific issue into the case and there is no evidence that AAR ordered that material or failed to honor any purchase order it issued. Moreover, AAR contends that the report of IFP's damages expert does not address this claim or factor it into his damages calculation. As such, AAR claims that IFP's failure to provide substantiated evidence to support this damages issue warrants the Court granting summary judgment in AAR's favor.

IFP argues that the Baltimore damages were included in the Pretrial Order, which supersedes the pleadings, so the Court can and should allow them. IFP claims that these damages should not be surprising to AAR because Kincaid testified about the shipments sitting in the Port of Baltimore, and AAR chose not to ask follow-up questions at the deposition. IFP also argues that the material was delivered to the Port of Baltimore because the Supply Agreement mandated that IFP continually manufacture balsa panels for AAR. Additionally, IFP claims that the losses are straightforward, so they do not require an expert to calculate them.

Because this damages claim was mentioned in the Pretrial Order, the Court will assume without deciding that its inclusion is sufficient to rule on the merits despite the argument never appearing in the pleadings.

IFP relies on this portion of Kincaid's testimony to support its argument:

> We had over 400 pallets of AAR inventory in balsa wood in December. . . . We had over 400 pallets in January. We had over 500 pallets in February, and over 300 pallets in March. . . . We had . . . for a small company, a tremendous amount of financial cost in an inventory that was sitting in Baltimore that isn't good for anybody else in the world.

This excerpt from Kincaid's deposition is the only evidence IFP presents before the Court to support this claim.

There is no clarification as to which years this testimony is referring. From context clues, the Court assumes this statement is referring to December 2019, January 2020, February 2020, and March 2020. If that is the case, and IFP claims that AAR breached in July 2021, it makes little sense that deliveries from late 2019 and early 2020 would still be sitting *currently* at the Port of Baltimore as IFP claims. AAR continued to place purchase orders through all of 2020 and through August of 2021, so the pallets referred to in the testimony above should have been distributed well before AAR's alleged breach occurred.

Without knowing the years to which this testimony refers, it is also unknown whether AAR ever ordered these materials. Without this information, it is impossible to tell whether AAR failed to honor any purchase order it issued. Thus, the Court lacks information on whether the materials were ever ordered; if they were ordered, when they were ordered; and how much they cost. This unknown information is essential for coming to a reasonably certain damages calculation.

On summary judgment, IFP, as the plaintiff, must carry its "burden of proving [its] damages to a reasonable degree of certainty."[49] But, the evidence before this Court simply does not establish a basis upon which damages can be calculated to a reasonable degree of certainty. Without such evidence, IFP has failed to meet its burden, and so it may not recover damages for the wood stored in the Port of Baltimore. Accordingly, the Court grants AAR summary judgment on excluding the costs of the stored wood at the Port of Baltimore from IFP's damages calculation.

In sum, IFP cannot show that it suffered damages before it waived the requirements of the Supply Agreement in December of 2019. Nor can IFP show that it suffered damages after the

---

[49] *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (7th Cir. 2007).

parties instituted the APOs in early 2020. Because IFP cannot show AAR breached after IFP's waiver and cannot demonstrate damages prior to IFP's waiver, AAR is entitled to summary judgment on the entirety of IFP's breach of contract claim. As such, both parties' motions to exclude expert testimony are moot.

It is not completely clear to the Court, following the above rulings, whether any issues remain undetermined in this case. Therefore, the parties are directed to simultaneously file statements with the Court on or before January 29, 2025, as to what issues, if any, they believe remain for determination in this matter. This filing shall not reargue matters the Court has already addressed in this Memorandum and Order.

**IT IS THEREFORE ORDERED** that Defendant AAR's Motion for Summary Judgment (Doc. 122) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff IFP's Motion for Partial Summary Judgment (Doc. 131) is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that Defendant AAR's Motion to Exclude Expert Testimony (Doc. 120) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that Plaintiff IFP's Motion to Exclude Expert Testimony and Report (Doc. 125) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that the parties are to advise the Court no later than January 29, 2025, of any issues either party believes remain unresolved following the above rulings.

**IT IS SO ORDERED.**

Dated this 15th day of January, 2025.

*Eric F. Melgren*

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE